Turn to the third case on a day calendar. 20 dash 2262 Smith against Brookhaven Science Associates at all. Mr. Bergstein. Yes. Um, good afternoon, your honor. Um, Steve Bergstein for the plaintiff appellant. This is a hybrid proceeding. Plaintiff is suing the union. Uh, alleging, um, denial of a duty of fair representation as to the union. A wrongful discharge as to the employer. So we have two main issues here, a union liability and management liability. And I'll address each in turn. Number one, the jury may find that the union declined to handle plaintiff's arbitration in bad faith or for arbitrary reasons. And a couple of reasons for this first, the record shows that the union gave up on the plaintiff gave up on the plaintiff early on, early in the investigation. Uh, when BNL management, um, began working on the case, the union president told plaintiff get another job quote. I've seen this happen a million times. Just get a job. That's page five 95 of the record. Uh, plaintiff said he had witnesses who could vouch for him and, uh, verify his side of the story. The union didn't want to know the names of these witnesses that's page 609. And upon initially hearing the charges, the union president said that the plaintiff was basically screwed. He used a stronger word in that, but you get my point. So the union then conducts what, what it argues is a full investigation. It wasn't a full investigation. Uh, three of the witnesses, the union claims to have interviewed, uh, in connection with the allegations actually signed affidavits in this case, claiming that no one from the union spoke to them. So that demonstrates bad faith nature of the representation. The union did not conduct a full investigation into the charges. And the union, the union did not obtain the investigative report commissioned by BNL, uh, Brookhaven national laboratories into the allegations against the plaintiff. Uh, management just wouldn't provide it. The union requested it repeatedly and had the union, uh, obtained a report through better advocacy. It would have found that inconsistency and significant, uh, factual disputes relating to whether the plaintiff was even guilty of these allegations, which are specifically that many employees who were in a position to hear the plaintiff make these so-called threats, never heard him make these threats. So, you know, the union had a duty to represent the plaintiff if there was a basis for the plaintiff to prevail at the hearing. And that brings me to the arguments as to whether he was fired for just cause. And that principally involves the claim against BNL, uh, plaintiff could have prevailed at this hearing. You know, an arbitrator could have, could have credited plaintiff's testimony and the testimony of his coworkers that he didn't threaten anybody and that, uh, he was a long-time employee with the company without incident, uh, these allegations were out of character for the plaintiff. Um, there's allegations about knives in this case, but there's a context to the knives, uh, management found the pocket knife on the plaintiff, but we have witness affidavits who say that it was not uncommon for employees in this type of work to be carrying pocket knives. Excuse me, your first three minutes have expired. Okay. Thank you. Um, they also claimed that they found a knife in the plaintiff's trunk, further supporting their claim that plaintiff was violent and he was a threat, but we have evidence that this knife was actually a Christmas present for one of plaintiff's coworkers and that very coworker signed an affidavit stating that he understood that this was going to be a Christmas present for him, but the knife was never given to him because it was seized by the police. There's an allegation that they found a catalog in the plaintiff's locker, uh, featuring AR 15 guns. Uh, plaintiff said it was commonplace for catalogs like this to be in the workplace. The catalog itself was about 20 years old. And again, coworkers corroborated this account. Uh, we, and their affidavits that, uh, gun ownership by, uh, people who work here is, is common and we do have quote, numerous gun magazines lying around the lunchroom and nobody ever complained. So finally, um, with respect to the bad faith nature of plaintiff's termination, um, many of the allegations against the plaintiff involving his alleged threats, uh, took place at these morning team meetings. And by my count, according to the BNL report, five employees claimed to have heard plaintiff make these threats. Eight employees said he never made any threats, including the plaintiff's supervisor. And, you know, if he had raised his voice as, as defendants claim, he did, everyone would have heard it. So my point here is that had the union gone to bat for the plaintiff and, uh, proceeded to arbitration and fought for this guy, so he wouldn't lose his job. They had ammunition to protect them. They had arguments. I mean, I've done labor arbitrations. You know, you, you have an issue of fact, uh, management says one thing, the employee and his witnesses say another thing. You swear them in and you, you let the arbitrator decide what happened. And we know the standard guarding arbitration decisions. The arbitrator may do justice as they see fit to applying their own sense of law and equity. And it is, it is far from a stretch to think that had this case gone through an arbitration with the evidence that we now know, uh, relating to the knives and the alleged threats that the plaintiff could have prevailed at this hearing, and they could have saved his job. And, you know, because the union didn't fight for the plaintiff and because there was a basis for the plan to win, he essentially lost his job in, in violation of the labor laws guiding this case. So the argument primarily is that summary judgment was improperly granted in this case. And this case should be heard by a jury in the Eastern district of New York. And if the Mr. Bergstein, uh, this is Jessica. Um, is there anything in this record that should cause us to question the credibility of the five employees who said that they had heard Smith threatened others with a knife? There is evidence in the record, and we have a section of that in our brief that there was, there were divisions in the workplace. And I guess this happens in some of these workplaces where people just don't like each other and they had it in for Smith. And, you know, that could have been a basis for, for management to raise concerns about the motives of these witnesses. But, you know, if, if, if the BNL report that, that the company commissioned looking into this shows that more employees didn't hear threats than did hear threats, you know, that's enough for management to think, you know, maybe this didn't happen, you know, what's going on here. And, you know, maybe, maybe he didn't do it. I mean, plaintiff's own supervisor didn't hear this and he would have had these threats been made at the morning meetings. And so, you know, this is what labor arbitrations are all about. You have, you know, bring in witness after witness and you swear them in and they, they, they tell the arbitrator what they know and what they saw and what they didn't hear. And, you know, like a trial and the arbitrator could find that management should have known number one, um, not enough people heard these threats to make them credible. And number two, the knife evidence, uh, which defendants rely heavily on in this case, uh, can easily be placed in context through the plaintiff's coworkers. If the court doesn't have further questions, I can, um, be heard again on rebuttal. You've heard, you've reserved three minutes and we'll hear from, uh, Mr.  Good afternoon and may it please the court. This is Mark winger of law firm, Jackson Lewis, and I represent the appellees, Brookhaven national laboratory and the five individual defendants who are union members and coworkers of the appellant, Mr. Smith. We do not represent Bob McKay, however, but in some respects, he and the others who were the subjects of the graphic threats of violence that were reported to the lab have a greater interest in this proceeding than any of the parties. An independent investigator was told that Mr. Smith had said, quote, I want to stab Bob McKay in the jugular so I could be up close and personal to see him bleed out that remark by itself would be just cause to terminate Mr. Smith. But when that threat is combined with multiple similar reports from five separate witnesses to an independent outside investigator, the only course of action open to any responsible employers, crystal clear. They have to eliminate the threat and terminate his employment. If those undisputed facts are not cause for termination, what will happen the next time an employer receives a complaint like this should fear of endless litigation, force employers to look the other way. Should it require that the alleged author of the threat threats be given a slap on the wrist? If so, would Bob McKay want to come to work the next day? Would any other target of threats of violence in the workplace want to come to work? The district court found that the lab had just and reasonable cause in this case to terminate Mr. Smith's employment on the undisputed facts, and that decision should be affirmed. Now, as the court knows, this is a hybrid section 301 action, and the plaintiff must show both that the employer violated the collective bargaining agreement and that the union violated its duty of fair representation. And here, Mr. Smith can do neither. I'll let the union address the duty of fair representation claim, but the undisputed facts are more than sufficient to show that the lab had just caused to terminate Mr. Smith. The lab received two anonymous complaints about Mr. Smith's alleged about a different employees, alleged drug use and workplace safety issues. Importantly, these complaints were not about Mr. Smith. The focus was on an individual whom the parties have designated as employee X. Well, in response to those anonymous complaints, the lab hired an outside human resources firm to conduct an open-ended two day investigation of the entire department to see what prompted the complaints. In the course of that investigation, five separate individuals reported to the investigator that Mr. Smith had made graphic threats of violence, most involving knives. They, the comments such as I'd like to stab him up close and personal. So he knows I did it. My knife is sharp. Liar should be nailed to the cross. You touch me again and I'll fillet you. The investigator did the right thing. She immediately notified management and they interviewed Mr. Smith, who, as we know, denies the threats, but he had a knife on him and he had another one in his car at the lab. Well, the lab first suspended him and then eventually terminated Mr. Smith's employment, but the union filed a grievance. Excuse me. Your first three minutes have expired. Thank you. So the union filed a grievance. The grievance was denied by the lab. And then the union chose not to pursue the arbitration faced with the overwhelming evidence of potential serious threat of workplace violence. Those are the undisputed facts. And on that basis, the district court properly concluded that the lab had just caused to terminate his employment. Now, Mr. Smith comes forward to attack this irrefutable evidence with smoke and mirrors, the first thing he tries to rely on in his papers, at least not an argument here is an unrelated investigation into alleged theft of time. And that's, that's nothing more than a red herring. It's a distraction. That investigation took place months and months earlier, had nothing to do with Mr. Smith or with threats of violence. That whole narrative, which occupies a large part of the information that, uh, the appellant submitted is at best a theory and more likely a fabrication. The declarations that the appellant has submitted were inserted into the record after the fact on a motion to reconsider and shouldn't even have been considered. So the court properly gave them a look and concluded that they were, that they didn't change the equation in any respect. They didn't raise any tribal issues of fact. There are no admissible. There's no admissible evidence whatsoever to support this theory. In fact, the argument is based on an implausible theory that the defendants wanted to get employee X fired. And somehow instead of setting up employee X, they set up Mr. Smith because he somehow sided with employee X and none of this it's in the affidavits that were submitted after the fact, but it's hardly admissible and certainly not sufficient or material to raise a tribal issue of fact. No reasonable fact finder can conclude that this illogical theory outweighs five separate reports of graphic threats of violence. Next, the appellant tried to rely on the declarations of his work friends. Now, you know, judge Brown, I think had the best response to this purported evidence. Um, you know, a lot of these so-called witnesses said they didn't hear Mr. Smith make these threats. Well, they weren't there. There was no affidavit connected them to the specific time and place where the threats were allegedly made. And judge Brown said, this is like being pulled over for running a red light. Five eyewitnesses come forward to say that they saw you run the red light and you say, yeah, well, a million people didn't see me run the red light. So you should conclude that I didn't on that basis. It doesn't make sense. It's not material. The information, the affidavits that the plaintiff is relying on do not connect the time and place of, uh, of the actual threats to any personal knowledge that they have, and therefore they're not material. I think council has suggested that the threats might have been made at the morning meetings, but the investigation conducted by the human resources consultant did not pinpoint those threats to the morning meetings, they were just reports of threats, multiple reports of threats by various different people. So for his work friends to come forward and say, we never heard it. Is it relevant? It makes no difference. Mr. Langer, uh, you and Mr. Boso are dividing your time. I've given you a little extra time, but, uh, let me just ask my colleagues if they have any questions for you. And if not, we'll turn to Mr. Bosa, judge Walker questions. No questions. Judge Wesley. No, I have done. Thank you. Okay. So let's turn to Mr. Boso on behalf of the union. Good afternoon. Your honors and may it please the court. First thing I'd like to point out is that in a duty of fair representation case on the federal law, the union is accorded wide discretion in dealing with the grievance matters. They can consider the interest of all the members, not just the individual employee, and it's well settled that individual employees do not have an absolute right to agreements to arbitration. Now, uh, Mr.  You have an argument to make, go to arbitration and make it, but unfortunately that's not the standard under federal law for Mr. Smith. In fact, the case law shows that the union has the decision and determination and discretion to determine the merits of the case. They don't have to bring cases to arbitration just because there is an argument that could be made. Now, in this case, plaintiffs asking you to ignore one simple undisputed fact, multiple coworkers came forward, attributing violent, threatening, and harassing remarks to the plaintiff. That undisputed fact was available to the Brookhaven National Lab when it terminated the plaintiff and it was available to the union when it decided not to pursue arbitration. Reliance on this fact in the union's decision-making process cannot be said to be arbitrary, irrational, dishonest, or in bad faith. Three years of litigation, five depositions, I'm sorry, 11 depositions, full discovery in federal court, and essentially all the plaintiff has to say is that he's denying that he made the remarks and that other coworkers never heard him made the remarks, but as Mr. Wenger pointed out, that's not evidence that those remarks were not made and these events did not occur. There's no evidence in the record of fraud. There's no evidence in the record of any deceit or dishonesty regarding union's investigation of findings. There's no evidence of collusion between the union and Brookhaven National Laboratory. There's no evidence that the union intimidated, coerced, or forced any of Smith's coworkers to attribute threatening, harassing, or intimidating statements to Mr. Smith. In fact, plaintiff's counsel at oral argument, when being questioned, suggested that an arbitrator or fact finder would have had to wrestle with whether or not they believe that the plaintiff made the statements or not. Well, before you get to that point, the union gets to make the decision first. They're allowed to judge the credibility of the individuals it interviewed, and they're allowed to make the determination as to whether or not an underlying grievance has merit. And even if they're wrong in that underlying determination, that's not a breach of the duty of fair representation. Now, there is a question about whether the union interviewed three people or six people in its investigation, but there's no dispute that they interviewed three, and there's no dispute that those three made statements to the union that Mr. Smith was threatening people, threatening to slash people with a knife, harassing people, and intimidating them throughout the workplace. Those facts are not disputed. Additionally, what's not disputed is that anonymous complaints that were submitted to the laboratory were not about Smith, but about another employee, employee X. Your first two minutes have expired. Thank you. Brookhaven, the plaintiff in its papers, makes a lot of the fact that one of the anonymous complaints was submitted by union vice president Joe Pagano. They try to claim that this taints the rest of the union's investigation because the union vice president submitted the anonymous complaint. However, again, undisputed that those anonymous complaints were not about Mr. Smith and were not about conduct attributed to Mr. Smith, but were about another employee. That's admitted by the plaintiff in their response to the 56.1 statements at JA1239 paragraph four, JA1240 at paragraph five, JA1224 at paragraph nine, and JA1228 paragraph 37. Uh, Mr. Pagano was not conflicted. He did not make a complaint about Mr. Smith. All he did was bring a few of the coworkers that work in the same shop that Mr. Pagano and Mr. Smith work in to Frank Rainer. And Frank Rainer conducted the investigation on his own. It's undisputed that he was present when Mr. Smith was questioned on 12, 2017 by the employer. He witnessed Mr. Smith's demeanor when he denied the allegations. He saw the knives that were found on Mr. Uh, Smith's person. Uh, he provided Mr. Smith with guidance during that hearing that was followed shortly after the union filed a graven, grievance. They requested the investigators report as a plaintiff points out in this lies, any allegation that the union packed it in now they didn't get it. They weren't successful. A plaintiff says perhaps it was better advocacy, but you know, the plaintiff's subjective belief as to what better advocacy is, is not the deciding factor in whether or not the union breaches duty of fair representation. You know, they tried to get the report. They attended a step three hearing on behalf of the plaintiff. They questioned three of the coworkers who made these reports. So in the absence of getting BNLs actual report, they were able to attain statements from three workers who they had no reason to believe were lying. Uh, and provided that information and relied on that information and reaching its decision not to pursue the matter to arbitration. Uh, this was presented to the executive board, six executive board members, uh, voted unanimously not to proceed to arbitration. Mr. Smith was timely notified of union's decision not to pursue arbitration. And all of these facts are undisputed. Thank you very much, Mr. Bosa, Mr. Bergstein, you've reserved three minutes. Yes. A couple of points. I haven't heard defendants explain why an arbitrator cannot rule in favor of the plaintiff in a case like this, when you have more witnesses at the morning meetings who didn't hear the plaintiff make threats than the number of witnesses at the meetings who claimed they did. So, uh, BNL counsel said there was irrefutable evidence of this. There's not irrefutable evidence. We have people under oath who said they were at the meetings. They heard nothing and they said it on the road and they could testify up at the arbitration and you let the arbitrator determine whether it's true or not. These are serious allegations and it was out of character for plaintiff to have allegedly made them. So, so the question is what's going on here. Um, BNL counsel suggested that the plaintiff's, um, coworkers or affidavits don't connect their observations to the particular time and place, uh, when the threats were reportedly made, but the BNL report doesn't give dates of when plaintiff was making these threats either. So, you know, but they, but they do pinpoint these threats at the morning meetings, most of the negative evidence against the plaintiff took place at these morning team meetings. If people didn't hear him say it, then the inference is he didn't say it, including his supervisor, kicking a chair, making death threats. These are not things that you're going to, um, innocently overlook at a meeting like this. So it's true. The union has some degree of discretion, whether to proceed against an employee, but there are limits to that discretion. It can't be arbitrary and it can't be irrational. And it doesn't look like the union went to bat for this guy. They never did get their hands on the BNL report, which contained the evidence that would have exonerated the plaintiff and would have been useful at the hearing. So, you know, bad faith cannot be good. Faith cannot be presumed as a matter of law on this record. So, so for these reasons, this case should be remanded to the district court for trial on the merits against the union and the employer. Thank you. Thank you, Mr. We'll reserve decision 20 dash 20 to 62 and thank counsel for their arguments.